## JOSE TRUJILLO V. STATE.

No. 29,457. May 21, 1958.
Appellant's Motion for Rehearing Overruled
(Without Written Opinion) June 18, 1958.

*J. P. Moseley,* Dallas, for appellant.

*Henry Wade,* Criminal District Attorney, *Ben Ellis, Ray Collier, A. D. Jim Bowie,* Assistants District Attorney, Dallas, and *Leon Douglas,* State's Attorney, Austin, for the state.

WOODLEY, Judge.

The offense is driving while intoxicated; the punishment, forty-five days in jail and a fine of $50.

It is undisputed that the appellant was driving an automobile upon a public highway at the time and place alleged.

Officer Huber of the Dallas Police Department, who saw appellant at the scene of a collision, and Officer Heath who saw

appellant at the city jail shortly after the collision, testified that they observed appellant's actions and conduct and smelled the odor of alcohol on his breath, and expressed the opinion that he was intoxicated.

Officer A. D. Heath, Jr. testified, without objection, that upon arrival at the city jail he gave appellant intoximeter test No. 5475. He testified as to such test, in part:

"Q. Describe briefly what is necessary for you to do in order to administer the test. A. I take it according to the instructions. It comes from a paper carton we draw from the Crime Lab. Once the test is assembled by me it is administered by him blowing his breath in this balloon. When the balloon is full I take a color reading as the air passes over a chemical.

"Q. About what size did he blow this balloon to? A. About the size of a small basketball or volleyball * * * it is sort of hard to describe.

"Q. After he blew his breath in that did you allow the breath to pass through the chemical? A. Yes.

"Q. And after that * * *. A. I sealed the test up and turned it in to the Crime Laboratory.

"Q. And after you finished the test you sealed it? A. Yes, sir.

"Q. And what did you do with it? A. I took it to the Crime Laboratory."

J. C. Day, Lieutenant in control of intoximeter tests, testified without objection:

"Q. Officer, calling your attention to the 28th day of January, 1957, I will ask you whether you had occasion to handle Intoximeter Test Number 5475? A. Yes, sir.

"Q. Where did you first see it on that date? A. It was returned to the laboratory box provided for that purpose at the Police Department Laboratory.

"Q. What did you do with that? A. I delivered it to Parkland Hospital in the custody of Dr. Mason."

Lt. Day further testified that he delivered this particular test to Officer Heath who picked it up and signed for it, and that was the last time he saw it until the next day; that he did not know who placed it in the box on January 27, and that he delivered it to Parkland Hospital on January 28.

Dr. Mason, toxicologist for the city and county of Dallas, testified as to his training, experience and qualifications as a chemist and with intoximeter tests, and testified:

"A. This instrument has been employed in this area for the past six or seven years, and a good many thousand instruments have been analyzed, the analysis of which has been under my supervision during that time.

"Q. Describe in laymen's terms what the intoximeter test is. A. The intoximeter is an instrument which is employed to determine the concentration of alcohol in a subject's blood by virtue of analyzing his breath for alcohol.

"The reason this can be done is that it is known that the alcoholic content of a subject's breath is proportional to that of the breath circulating in the lungs at the time.

"The instrument itself, consists of a rubber ballon, into which a breath specimen is blown. The balloon is connected with a chemical train connected with two tubes connected with each other. The first contains magnesium percholate, and the breath passing through the balloon to this tube, all of the moisture in the breath is removed by the chemical.

"The dried de-alcoholized breath passing into the second tube, which contains a chemical called ascarite * * * this measures the carbon dioxide present in the breath specimen. This second tube is weighed before the instrument is used in the test, and again afterwards, and the difference in weight represents the quantity of carbon dioxide in the breath that passes through it * * *.

"Q. * * * Are you familiar with the intoximeter test given the defendant, Number 5475? A. Yes, sir.

"Q. When was the test delivered to you for analysis? A. On the 28th day of January, 1957.

"Q. From whom did you receive it? A. J. C. Day.

"Q.   Where did you receive it? A.   It was delivered to me at my office in Parkland Memorial Hospital.

"Q.   Was the outer container sealed, the case * * *. A.   The case was sealed.

"Q.   Was there any information on the label? A.   Yes.

"Q.   Would you tell the jury what that information was? A.   May I refer to my notes * * *.

"MR. ELLIS: Yes.

"Q.   (By Mr. Ellis) Those were kept under your care and supervision? A.   Yes, they are the official records of Parkland Hospital. The slip that sealed the case had the following information on it, 'Jose Trujillo, 3314 Cole, 33 seconds; E. D. Heath, R. D. Huber, 12-6-57, 11:00 P.M. Cedar Springs and Harwood, investigation DWI.'

"Q.   Does your record reflect who made the mechanical analysis of the test? A.   James Louis and Herbert Williams.

"Q.   What part of the test did they perform? A.   They performed the actual weighing of the ascarite tube and the magnesium percholate tube used * * * the calculation I myself prepared.

"Q.   You made the final calculations? A.   I did."

This testimony having been given by Dr. Mason without objection, he was asked "What do your official records show this test to be?" Objection was made "because he testified that a man by the name of Williams and another man did the actual weighing and all of the mechanical analysis of this test and reported the results to him, therefore it would be hearsay" and added the objection:

"The defendant has a right to be confronted by the witnesses against him. This man has testified that these two men weighed these two things, did all of the actual mechanical testing, and reported the results to him and that he then made the calculation. We object to this witness testifying as to the opinion of these witnesses about the weighing and the analysis because it would be hearsay, and we have a right to be confronted by these witnesses."

Before the witness answered the question to which these objections were overruled, he was asked and answered over objection that it was a conclusion: "Was that analysis made under your direct control and supervision? A. Yes."

Dr. Mason then testified without further objection:

"Q. (By Mr. Ellis) What do the official records show the result of the test to be? A. The results show the blood alcoholic concentration of the individual to be 0.173 per cent.

"Q. What proportion of adult person would be under the influence of intoxicating liquors if the blood alcoholic concentration of the individual was as much as 0.100? A. In my opinion, any individual with a concentration of 0.110 in the blood would be under influence of alcohol.

"The effect of alcohol varies, of course, in individuals; some would come under the influence at a lower figure but any individual would be at one-tenth per cent.

"Q. Is 0.173 a greater concentration than 0.100? A. Yes, 1.73 times as much.

"Q. Therefore, would the person with the blood concentration of this .173 * * * is that person under the influence of alcohol? A. Yes, sir."

On cross-examination Dr. Mason testified that the ascarite tube was weighed *originally when the instrument was prepared for use by Herbert Williams;* that he was in the laboratory, but did not recall seeing Williams weigh the tube. "I cannot see him weigh all of the individual tubes."

He testified further that James Lewis "weighed the ascarite tube *after the instrument was used* and conducted a distillation of the ingredients;" that he was on the premises but "I cannot recall this particular test." He readily admitted that "the analysis has to be conducted correctly of course."

At the conclusion of Dr. Mason's testimony appellant moved to strike it "as based on conclusions, because he testified that he did not see these two witnesses make the tests and therefore his opinion is based on hearsay. Under the Constitution we have a right to be confronted by their witnesses * * * we have had no opportunity to cross-examine them."

There is but one legal question presented: Was Dr. Mason's testimony concerning the official records of Parkland Hospital showing the results of the analysis of the test admissible as against the objection that it was hearsay?

It is true that appellant denied that he consented to the taking of the test but this testimony was given after the witness Huber had testified without objection that it was taken, and after Dr. Mason had testified from the hospital records as to the result of the analysis of the test with no objection save that which raised the question stated; that is, whether Dr. Mason's testimony was hearsay.

The question of whether appellant consented became immaterial after it was shown without objection that the test was made and showed intoxication. Dominguez v. State, 161 Texas Cr. Rep. 124, 275 S.W. 2d 677; Atkinson v. State, 157 Texas Cr. Rep. 556, 251 S.W. 2d 401.

It appears that the hospital records were admissible, and that the very purpose of Article 3737e V.C.S. was to make it unnecessary that the state call every person who had a part in conducting the analysis and making the record at the time the analysis was made. Leonard v. State, 161 Texas Cr. Rep. 470, 278 S.W. 2d 313; Jackson v. State, 159 Texas Cr. Rep. 228, 262 S.W. 2d 499; Bryan v. State, 157 Texas Cr. Rep. 592, 252 S.W. 2d 184.

To reject the records as evidence would defeat proof by laboratory analysis, for as indicated in Dr. Mason's testimony, it could not be expected that each chemist who had a part in the analysis could remember every tube he weighed and identify it by number.

Had Wililams been called to testify as to the weight of the ascarite tube prepared for test 5475, and had Lewis been called to testify as to its weight after breath had been passed through it, they no doubt could have testified only as did Dr. Mason; what the records made at the time showed. Art. 3737e V.C.S., by its terms, authorizes proof by the testimony of the entrant, custodian or other qualified witness, "even though he may not have personal knowledge as to the various items or contents of such memorandum or records," and that "such lack of personal knowledge may be shown to affect the credibility of the memorandum or record, but shall not affect its admissibility."

There was ample evidence aside from the intoximeter test to prove appellant's intoxication.

He admitted having consumed three beers, but denied that he was intoxicated.

He admitted that he had plead guilty to illegally possessing marihuana and was under a five year probated sentence for that offense.

Under the facts stated the jury resolved the issue against him; found that he was intoxicated on the occasion in question, and we find the evidence sufficient to sustain the conviction, and no reversible error.

The judgment is affirmed.

DAVIDSON, Judge, dissenting

About 10:15 o'clock on the night of January 26, 1957, appellant, a thirty-one-year-old Mexican who could not speak or understand English, was involved in a motor vehicle collision at a street intersection.

Dallas policeman Huber and another officer concluded after arriving at the scene of the collision that in their opinion appellant was under the influence of intoxicating liquor, and arrested him for drunken driving. Huber testified that as they "saw he could not understand what they were trying to put over to him," they took appellant to the city hall, where a Mexican girl by the name of Gloria was employed and who was contacted to act and did act as interpreter during the officers' questioning of the appellant. Judging from what happened thereafter, a reasonable interpretation to be given to what the officers meant when they said that appellant could not understand "what they were trying to put over to him" is that they were trying to get him to agree to take an intoximeter test to verify the presence and ascertain the percentage of alcohol in his blood. In other words, the officers were trying to get appellant to waive his constitutional right not to give evidence against himself and to waive confrontation of witnesses against him. With this in mind, Gloria, the interpreter, is brought into the presence of the officers and the appellant. Huber testified, in effect, that Gloria explained to appellant the accusation against him and that the officers had an intoximeter, a machine by which the alcoholic content of his blood

might be ascertained; and that after her explanation appellant was given the test.

Because it was hearsay, appellant objected to all the foregoing testimony by Huber, and urged that the interpreter's testimony would be the best and only evidence of her statements to him (appellant) and of his replies thereto.

The objection was overruled.

Although at the time of the trial Gloria was still in the employ of the city of Dallas, she did not testify as a witness.

Appellant's objection to Huber's testimony was well taken and should have been sustained. One who does not speak Spanish can not testify to a conversation in Spanish between an interpreter and another person. How was Huber to know what Gloria said to or told appellant if he (Huber) did not understand Spanish? So then, Huber's only information about the matters to which he testified was obtained from what Gloria told him—which, upon its face, was hearsay. The following cases are directly in point: Cervantes v. State, 52 Texas Cr. Rep. 82, 105 S.W. 499; Boyd v. State, 78 Texas Cr. Rep. 28, 180 S.W. 230; Turner v. State, 89 Texas Cr. Rep. 615, 232 S.W. 801.

After the conversation between him and Gloria, appellant was carried by the officers to Officer Heath, accident investigator for the Dallas police department, who proceeded to give him the intoximeter test. This test consisted of appellant's blowing his breath into a rubber balloon and inflating it until it was about the size of a small basketball or volleyball." Appellant said he had to blow three times into the balloon before it was large enough.

Officer Heath testified that in his opinion appellant was at that time under the influence of intoxicating liquor.

What is a valid breath test? In Hill v. State, 158 Texas Cr. Rep. 313, 256 S.W. 2d 93, this court laid down three essentials to the admission in evidence of the result of an intoximeter test:

The first essential is that proof be made that the chemicals were compounded to the proper percentage for use in the machine. There is not a line of evidence in this case showing a compliance with this first essential.

Officer Heath testified that he gave the test to appellant. He described the administering thereof as follows:

"I take it according to the instructions. It comes from a paper carton we draw from the Crime Lab. Once the test is assembled by me it is administered by him blowing his breath in this balloon. When the balloon is full I take a color reading as the air passes over a chemical."

The witness further testified that he sealed up the test and turned it into the crime laboratory and that the number thereon was 5475.

The evidence does not show when, where, or by whom the test was so numbered.

Where is the proof that the chemicals were compounded to the proper percentage, as required by the above holding? There is none.

The second essential to be shown is that the operator of the machine and the machine, itself, were under the periodic supervision of one who had an understanding of the scientific theory of the machine.

Here is all the testimony relative to that essential: Officer Heath, who gave the test, testified that he "had experience in administering this test" and that he had "had training in it." This sole testimony upon the subject wholly fails to comply with the second essential.

The third essential is that there must be proof by a witness qualified to calculate and translate the reading of the machine into the percentage of alcohol in the blood who could eliminate hearsay evidence, before the result of the intoximeter test is received in evidence.

This essential element is wholly without support in the testimony.

The requirements of the Hill case have not been met, and there was no apparent effort to do so.

If the Hill case is the law, the least my brethren could do would be to follow it and thereby hold inadmissible the evidence obtained by the so-called test.

The holding in this case is directly contrary to the Hill case. Both should not be permitted to stand.

Remember, now, we are dealing with test #5475 which Heath, the witness who gave the test, said he delivered to the crime laboratory.

Officer Day, a lieutenant in the laboratory having control of the intoximeter tests, found the instant test in the crime laboratory the day following the taking thereof the previous night, but he did not know who brought the test there. Day then delivered the test to Heath, who, he said, signed for it. The next day, being the second day after the taking of the test, Day again found it in the laboratory. He did not know who returned it. Day then delivered the test to Parkland Hospital and into the custody of Dr. Mason.

Note is taken of the fact that to this point there is a complete break in the continuity of possession of the test, as is shown by the fact that Day delivered the test to Heath first and then it was returned by some unknown person on the day following to the laboratory supervised by Day. Heath did not testify what he did with the test after Day delivered it to him. In so far as this record is concerned, the last person having possession of the test before its analysis was Heath, and he made no explanation as to what he did with it.

The next that is seen of what will now be called the so-called test—for it is wholly unidentified by testimony showing continuity of possession as the test taken by appellant—is in the office of the witness Mason at Parkland Hospital. It is by this witness that the state proved the result of an intoximeter.

Notwithstanding the fact that the witness Mason admittedly had no personal knowledge of the so-called breath test having been taken by the appellant, the witness had no hesitancy in testifying that he was "familiar with the intoximeter test given the defendant, Number 5475," which was delivered to him at his office in Parkland Memorial Hospital in a sealed case. After referring to what he called "the official records of Parkland Hospital," the witness testified that:

"The slip that sealed the case had the following information on it, 'Jose Trujillo, 3314 Cole, 33 seconds; E. D. Heath, R. D. Huber, 12-6-57, 11:00 p.m., Cedar Springs and Harwood, investigation DWI.' "

It will be noted that this is the first time appellant's name has appeared upon any so-called breath test and that there is nothing to show that the test above referred to was numbered 5475.

The witness Mason was then permitted to testify from his records that what he called "the mechanical analysis of the test" was made by "James Lewis and Herbert Williams" and that those persons "performed the actual weighing of the ascarite tube and the magnesium percholate tube used" but that he, Mason, "made the final calculations."

Attention is called to the fact that James Lewis and Herbert Williams, though shown to be available as witnesses, did not testify.

It was upon this predicate that the state sought to have the witness Mason testify as to what the test showed.

Appellant's objection that the testimony would be hearsay and a violation of his right to be confronted by the witnesses and that it called for an opinion and conclusion of the witness Mason was overruled.

Such testimony was not only subject to the objection of hearsay but it was in direct violation of the third essential as pointed out in the Hill case, supra.

The witness testified:

"The results show the blood alcoholic concentration of the individual to be 0.173 per cent."

Following the above, the witness Mason then testified that an individual with such blood concentration was " 'under the influence of alcohol' "—by which expression he meant:

"That alcohol present in the fluids of the body has affected the function of the brain in such a way that the facilities such as judgment, perception, coordination, reaction time, have become impaired, compared to what they were in the individual's normal state when there was no alcohol in his body."

The witness replied affirmatively to the question: "With this .173 in his blood would he have lost the normal use of his physical and mental faculties?"

At the conclusion of the testimony of the witness Mason, by a motion to strike appellant again renewed his objection to such testimony as being merely the witness's own conclusions. This motion was refused.

Testifying as a witness, appellant denied his intoxication. His version of the intoximeter test was as follows:

("Q. * * * What did the girl named Gloria say to you before you took the test?) A. I asked the girl to find out why they had brought me in there; I was scared and wanted to go home. Then the girl told me that they were going to take me upstairs to give me a test because they believed I was drunk.

"Then the girl says, 'You don't look like you are drunk."

"After I came down from upstairs she asked me how did I come out * * * .

("Q. Did Gloria ask you if you would agree to a test?) A. No, sir.

("Q. Did Gloria ever tell you that any test you might take could be used for or against you?) A. No, sir, all she told me was that they were going to take me upstairs to give me a test.

("Q. Did Gloria ever interpret for the policemen?) A. Yes.

("Q. What questions did she ask you as an interpreter before you took the test?) A. She did not ask me any questions. She just asked me why they had brought me in there.

("Q. Did she ever ask you a question, interpreting for a policeman, if you would consent to the test?) A. All she told me was that they were going to take me upstairs to give me a test; that if I passed the test they were going to let me go.

("Q. Were you intoxicated at the time of the collision, Jose? A. No, sir.

* * * *

("Q. Earlier in your examination you said that Gloria told you that if you passed the test that they would let you go.)

A. She told me if I was not drunk they would let me go.

("Q. *Was he* agreeable with her suggestions?) A. I was agreeable.

("Q. You consented at that time to take the test?) A. They did not ask me for my permission; they just said they were going to give me a test.

("Q. Did they hand you a balloon?) A. Yes, sir.

("Q. Had the girl explained the purpose of the balloon and the intoximeter test?) A. Yes, sir.

("Q. You did blow in the balloon?) A. Yes, sir.

(Q. Did the police force you to blow in it? A. They made me blow in the thing three times.

("Q. Did they use any physical force on you to get you to blow up the balloon?) A. No, sir.

The above testimony on the part of the appellant stands undisputed in this record. Moreover, the witness Huber testified to the same fact when, in answer to the question: "Did you get Trujillo to (say) something that he would agree to this test?" he replied, "No."

If it be conceded that the breath test to which the witness Mason testified and upon which he based his testimony was that of the appellant, then the undisputed evidence shows that the intoximeter test was obtained as a result of psychological coercion and mental force and that it was given without the free consent of the appellant.

Indeed, the facts strongly show that the intoximeter test was obtained as a result of false representations and promises as to the effect of the test and as to what would be done and the advantages appellant would receive if the test was taken.

When appellant testified that he did not consent to take the test—and that testimony is not denied and stands undisputed in this record—the intoximeter test is thereby rendered inadmissible, to say nothing of the further fact that there is no testimony refuting appellant's testimony as to what was said or done in order to obtain the intoximeter test.

The hearsay testimony of the officers as to what was said or

done at the time the intoximeter test was given could not and did not have any probative value. Hearsay testimony proves no fact.

But if it were conceded—which it is not—that appellant did agree to take the intoximeter test, such agreement did not constitute a waiver of his right to object to proof of the analysis thereof. No one contends that the appellant agreed that the analysis of the test might be used in evidence against him, as is required in the case of confessions.

It must be remembered that appellant was under arrest and in the custody of arresting officers when the intoximeter test was given. Of necessity, therefore, any testimony thus given comes within the condemnation of that long line of authorities which holds that oral statements made while under arrest are inadmissible. 18 Texas Jur., p. 142, Sec. 72, and authorities collated in Sec. 519(3), Criminal Law, 11 Texas Digest. Indeed, in Blackshear v. State, 123 Texas Cr. Rep. 111, 58 S.W. 2d 105, a specimen of the handwriting of the accused while in custody without statutory warning was held inadmissible. Also, in Brent v. State, 89 Texas Cr. Rep. 544, 232 S.W. 845, it was held that proof of the acts and conduct of the accused while under arrest was not admissible even for impeachment purposes. Why, then, would not a specimen of the breath under such circumstances come within the rule? The asking of the question answers it.

Proof of the intoximeter test and the analysis thereof was inadmissible under the authorities cited and for the reason stated.

But the error just pointed out is not the sole error. How do we know, or where in this record is there any testimony, that the test analyzed was that taken by the appellant? There is not a line of testimony from any witness that evidences such fact. Mason testified, although he admitted he had no personal knowledge thereof, that James Lewis and Herbert Williams had something to do with the test and that upon their report he based his calculations. Of course Mason's testimony was, upon its face, the rankest sort of hearsay testimony. But insofar as this case is concerned that appears to make no difference. Though available as witnesses, Lewis and Williams were not called to testify as to the test they examined or as to where they got it or who delivered it to them. Nor did they name, describe, or identify the test which they examined.

What became of test #5475? Who placed appellant's name on the test that was claimed to have been examined? Who left in Mason's office the report upon which he made his calculations? The answer to those questions remains a deep dark secret, insofar as the evidence in this case is concerned.

My brethren say that all this hearsay testimony as to the test, its examination, and analysis, and opinon of the witness Mason based thereon are admissible under the provisions of Arts. 3731a and 3737e, Vernon's R.C.S. As supporting that conclusion the cases of Jackson v. State, 159 Texas Cr. Rep. 228, 262 S.W. 2d 499, and Leonard v. State, 161 Texas Cr. Rep. 470, 278 S.W. 2d 313, are relied upon and cited in the majority opinion.

The holding in the Jackson and Leonard cases, as well as the application of the two statutes (3731a and 3737e, supra), was repudiated by this court in Estes v. State, 162 Texas Cr. Rep. 122, 283 S.W. 2d 52, wherein we held that certified copies of a report of the examination of a blood specimen made by the Department of Public Safety, a record of that department, was not admissible. It was therein said:

"None of the parties whose names were signed to these instruments appeared as witnesses."

The exhibits were admitted over the objection that they were hearsay and self-serving, that they denied appellant's constitutional right of being confronted with the witnesses who were going to testify against him, and that they deprived him of the opportunity to cross-examine the witnesses who signed the instruments.

If the certified copies, there, were not admissible, how much more so would an instrument or report that is not shown to have ever been based upon a test given to the accused be not admissible!

It must be remembered that the report the witness Mason had before him and that upon which he based his testimony was never shown to have been made from a test given to the appellant. There is an utter lack of identification or evidence showing that test #5475, which the state's witnesses said was that made by appellant, was ever examined by anyone.

The two statutes relied upon do not change, alter, or amend

the rule against admitting hearsay evidence. Rice v. State, 163 Texas Cr. Rep. 367, 292 S.W. 2d 114; Fite v. State, 158 Texas Cr. Rep. 611, 259 S.W. 2d 198; Smith, et al, v. Riviere, 248 S.W. 2d 526.

If Arts. 3731a and 3737e, R.C.S., authorize one's conviction and imprisonment upon hearsay testimony as shown and exemplified by the record in this case, then those statutes are void and unenforceable because they violate the constitutional right of an accused to be confronted by the witnesses against him — which right carries with it the further right of cross-examination (Art. 1, Sec. 10, Const. of Texas).

What has hapened and is happening to this appellant and to the established law of this state in affirming this conviction is, to my mind, appalling.

Here, is a thirty-one-year-old Mexican laborer who can not speak the English language is arrested for being intoxicated. The arresting officers are of the opinion that he is intoxicated, but for some unexplained reason appear to be unwilling to rest the question of his intoxication upon that opinion. So they conceive the idea of getting appellant to take an intoximeter test. Why did they want appellant to take an intoximeter test? A reasonable construction to be applied is that they had some doubt as to the correctness of their opinion or entertained some question as to whether a jury might convict upon their unsupported opinion. Under these circumstances appellant is carried to the officer having charge of the intoximeter.

The rubber balloon filled with appellant's breath was designated as #5475. What became of that test? The last person to have any connection therewith was Policeman Day, who left it in the office of Morton F. Mason at Parkland Hospital.

The state says, wholly by surmise and presumption, that test #5475 became and was the same test, bearing the name of the appellant, which Lewis and Williams analyzed and from which analysis the witness Mason testified that at the time the test was made the person taking it, as contended by the state, was so drunk that he had "lost the normal use of his physical and mental facilities."

Now if the witness Mason was right in his testimony—and the state contends that he was—then appellant did not have sufficient mentality to know what he was doing when he took

the test, let alone to waive a valuable right—guaranteed by the Constitution—by consenting thereto.

Where does that place the state? By one set of witnesses the state shows that appellant knew what he was doing when he took the intoximeter test and was aware of the rights he was waiving and renouncing by consenting to take the intoximeter test. By another witness the state says that at that time appellant had lost and was not possessed of normal mentality.

It is difficult to see how the state's position could be more inconsistent. If appellant had sufficient mentality to agree to take the intoximeter test, he was not as drunk as the witness Mason said he was. If appellant was as drunk as the witness said he was, then he did not have sufficient mentality to agree to take the test or to waive his constitutional rights. The state should not blow both hot and cold; it ought to be required to stand upon one or the other of the situations.

This entire record evidences that the intoximeter-breath test, obtained as shown by the undisputed facts in this case, is not a reliable medium for determining and ascertaining the percentage of alcohol in a person's system.

Here is what the test does and what use is made thereof in this case:

Appellant blows his breath into a rubber balloon and some two or three days thereafter two men make an analysis upon which a third person makes some calculations and upon those calculations he testifies that at the time appellant blew his breath into the balloon he was intoxicated to the point that he did not have the use of his normal physical and mental faculties. That testimony comes from a witness who never saw the appellant and knew nothing of his physical make-up or condition. The tesimony of the witness is but the intoximeter testifying through him, and the constitutional right of confrontation is denied.

The state had the testimony of living witnesses who were in position to testify, and did testify, as to appellant's intoxication. The state did not have to rely upon the intoximeter test.

Notwithstanding this open and flagrant violation of the rights of the appellant, which was to him a denial of due process, the majority opinion seeks to justify it not because it is lawful

but because appellant's counsel did not keep constantly upon his feet objecting and moving to disregard the testimony.

As I have pointed out, appellant's counsel did all that was required of him. He did register his objection and he did move to have the damaging testimony disregarded.

But whether or not appellant's counsel made a single objection throughout this case, this conviction ought not to stand, because the record, upon its face, reflects a denial of that fundamental fairness necessary to the very concept of justice.

I can not permit certain statements in the majority opinion to go unnoticed:

The majority opinion says:

"It is true that appellant denied that he consented to the taking of the test but this testimony was given after the witness Huber had testified without objection that it was taken, and after Dr. Mason had testified from the hospital records as to the result of the analysis of the test with no objection save that which raised the question stated; that is, whether Dr. Mason's testimony was hearsay."

What is the meaning or interpretation to be given to that language? It is that, because appellant did not register an objection either to the witness Huber's testimony that the intoximeter test was taken or to the testimony of Dr. Mason showing the result of the test, except that it was hearsay, his (appellant's) testimony that he did not consent to the taking of the test was unavailing and therefore did not affect the admissibility of the testimony obtained by the test.

All the testimony relative to the test, as well as that of Dr. Mason as to the result thereof, was introduced in evidence upon the presentation by the state of its case in chief.

As soon as the appellant was given the opportunity to testify, he did so and denied that he consented to take the test.

Remember, now, that appellant's testimony as to that fact stands undisputed in this record.

The two policemen could not speak Spanish. The interpreter who knew and was in position to know whether appellant

consented to take the test, though available, was not called as a witness by the state.

Notwithstanding such fact, my brethren say in the majority opinion that:

"The question of whether appellant consented became immaterial after it was shown without objection that the test was made and showed intoxication."

Until Dr. Mason testified, appellant was not harmed or injured by the evidence showing the test and the analysis thereof. It was the testimony of Dr. Mason as to what the test showed and his opinion based thereon that were both harmful and prejudicial to the appellant.

When appellant objected to that testimony, he challenged the validity of the test both as to his consent to take it and the requisites to taking a valid test and its analysis and to Dr. Mason's testimony based thereon.

Yet my brethren say that the question of consent to the taking of the test became immaterial because no objection was raised prior to the testimony of Dr. Mason showing intoxication.

But the opinion upon the subject of the admissibility of Dr. Mason's hearsay declaration and opinion does not stop there. Here is the additional holding of my brethren:

"It appears that the hospital records were admissible, and that the very purpose of Article 3737e V.C.S. was to make it unnecessary that the State call every person who had a part in conducting the analysis and making the record at the time the analysis was made.

"To reject the records as evidence would defeat proof by laboratory analysis, for as indicated in Dr. Mason's testimony, it could not be expected that each chemist who had a part in the analysis could remember every tube he weighed and identify it by number."

I have heard it advocated that the Constitution and its guarantees should yield to the doctrine of expediency and that when there is a conflict the rule of expediency should be recognized, but this is the first time I have seen that doctrine given judicial

sanction—for that, in my opinion, is exactly what my brethren are here doing.

There is a greater guarantee in our Constitution than that which says that every person accused of crime "shall be confronted by the witnesses against him." That right of confrontation carries with it the right of cross-examination and also condemns hearsay evidence as unworthy to establish any fact.

How can that guarantee exist and control if it is no longer necessary "that the state call every person who had a part in conducting and making the record at the time the analysis was made?" Yet that is exactly what the majority opinion holds.

But my brethren go further, when they say that "to reject the records as evidence would defeat proof by laboratory analysis." They say that guarantee of confrontation must yield in order that there might be preserved to the state the right to take his liberty from an accused by "proof by laboratory analysis," in violation of the guarantee of the Constitution.

There is nothing wrong with the idea of "proof by laboratory analysis," but such proof is authorized only when conducted in accordance with prescribed rules, the paramount one of which is that there must be no guess work or speculation and that the test must be carefully guarded and identified as that of the accused.

If there is to be a choice between preserving "proof by laboratory analysis" and the destruction of the constitutional guarantee of confrontation, the Constitution and its guarantee—in so far as I am concerned—must remain inviolate and be preserved.

Finally, the majority opinion says:

"Had Williams been called to testify as to the weight of the ascarite tube prepared for test 5475, and had Lewis been called to testify as to its weight after breath had been passed through it, they no doubt could have testified only as did Dr. Mason; what the records made at the time showed."

The astounding thing about that statement is that my brethren now hold that the absence of testimony on the failure by the state to call witnesses to testify to certain facts is justified because the absent witnesses "no doubt could have testified only as did Dr. Mason; what the records made at the time showed."

Are my brethren taking judicial knowledge that the witnesses Williams and Lewis could testify only as did Dr. Mason? It appears so. I can only say that such is a new and hitherto-unheard-of proposition, to me.

This unfortunate thirty-one-year-old Mexican had the right, as a citizen of this state, to the protection of all the guarantees provided by our Constitution. He had the right to be tried and convicted only in accordance with those guarantees and with the laws of this state.

Under our system of government, police can not compel people to furnish the evidence by and through which they are sent to prison. Under this record, appellant has been convicted in violation of that rule.

I respectfully dissent.